LISA L. OBERG (BAR NO. 120139)
loberg@mckennalong.com
FELICIA Y. FENG (BAR NO. 184346)
ffeng@mckennalong.com
MCKENNA LONG & ALDRIDGE LLP
101 California Street
41st Floor
San Francisco, CA 94111
Telephone: (415) 267-4000
Facsimile: (415) 267-4198

Attorneys for Defendant
METALCLAD INSULATION CORPORATION

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOMER MOORE,<br><br>Plaintiff,<br><br>v.<br><br>ASBESTOS DEFENDANTS (B*P) As Reflected on Exhibits B, B-1, C, H, I, J, N; and DOES 1-8500, et al.,<br><br>Defendants. | CASE NO. CV 10 1688<br><br>**NOTICE OF REMOVAL TO FEDERAL COURT PURSUANT TO 28 U.S.C. § 1442(a)(1) (FEDERAL OFFICER)** |

Defendant METALCLAD INSULATION CORPORATION (hereinafter "Metalclad") hereby gives notice of the removal of the above-entitled action from the Superior Court of the State of California, County of San Francisco, to the United States District Court for the Northern District of California, San Francisco Division, pursuant to 28 U.S.C. § 1442(a)(1). In support of its removal, Metalclad respectfully offers the following:

## I.
## JURISDICTIONAL GROUNDS FOR REMOVAL

1. Removal of this case is proper pursuant to 28 U.S.C. §1442(a)(1) as this is a civil action commenced in a state court against the United States or agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, sued in an official or individual capacity for any act under color of such office.

2. Original federal jurisdiction is not required for removal pursuant to 28 U.S.C. § 1442(a)(1). *See Willingham v. Morgan,* 395 U.S. 402, 406 (1969) ("the right of removal under § 1442(a)(1) is made absolute whenever a suit in state court is for any act "under color" of federal officer, regardless of whether the suit could originally have been brought in federal court."); *Jefferson County v. Acker,* 527 U.S. 423 (1999) (under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint).

## II.
## INTRADISTRICT ASSIGNMENT AND VENUE

3. On March 2, 2010, Plaintiff filed his Complaint for Personal Injury (Asbestos) ("Complaint") in *Homer Moore v. Asbestos Defendants, et al. (BP),* Case No. 275505 (Superior Court, San Francisco County, California).

4. A substantial number of defendants named in the Complaint are alleged to have regularly conducted business in the County of San Francisco.

5. Pursuant to Civil Local Rule 3-2(d), all civil actions arising in San Francisco County shall be assigned to the San Francisco Division or the Oakland Division of the Northern District of California. Venue is proper in the San Francisco Division of the Northern District Court of California because the underlying state court action was filed in the Superior Court of California for the County of San Francisco and all parties are subject to personal jurisdiction in this District.

6. On March 19, 2010, Plaintiff served Metalclad with the Summons and Complaint. In his Complaint, Plaintiff seeks damages for personal injuries (asbestosis) due to his alleged exposure to asbestos while working as a shipwright from 1964 to 1971 and an insulator from 1971 to 1974 at Mare Island Naval Shipyard in Vallejo, California. *See* Summons and Complaint attached as Exhibit A to the Declaration of Felicia Y. Feng ("Feng Decl."), which reflects a true and correct copy of all process, pleadings, and orders in the State Court Action that have been served upon Metalclad, as required by 28 U.S.C. § 1446(a).

7. Metalclad is filing this Notice of Removal within thirty (30) days of the service of Plaintiff's Complaint in this action, and thus removal is timely under 28 U.S.C. § 1446(b).

8. Whereas all defendants must consent to removal under 28 U.S.C. § 1441, a federal officer or agency defendant can unilaterally remove a case under 28 U.S.C. § 1442. *See Ely Valley Mines, Inc. v Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981). Therefore, removal of this case under Federal Officer Removal is timely and appropriate.

## III.
## PURSUANT TO 28 U.S.C. § 1442(A)(1)
## REMOVAL IS PROPER ON FEDERAL OFFICER GROUNDS

9. As stated above, this case is properly removed under 28 U.S.C. § 1442(a)(1), as this is a civil action commenced in a State court against the United States or agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, sued in an official or individual capacity for any act under color of such office. Metalclad has a federal defense to this action, *i.e.*, government contractor immunity from liabilities for injuries arising from any exposure to asbestos-containing thermal insulation from a shipment that it brokered that was used by the United States Navy on board Navy vessels.

10. Metalclad is a "person" within the meaning of 28 U.S.C. § 1442(a)(1). *See Fung v. Apex Corp.*, 816 F.Supp. 569, 572 (N.D.Cal. 1992) (finding that a corporate defendant was a "person").

11. Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiff's claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office. *See Mesa v. California*, 489 U.S. 121 (1989) (setting forth elements of federal officer removal); *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) (discussing government contractor defense); *Ballenger v. Agco Corp.*, 2007 WL1813821 (N.D. Cal. 2007) (upholding removal where alleged asbestos exposure occurred on Navy ship); *Fung v. Abex Corp.*, 816 F. Supp. 569 (N.D. Cal. 1993) (upholding removal where alleged asbestos exposure occurred in Navy shipyard and submarine); *Ferguson, et al., v Lorillard Tobacco Co., et al.*, 475 F.Supp.2d 725 (N.D. Ohio 2007) (upholding removal where alleged asbestos exposure occurred aboard Navy ship); *Nesbiet v. General Electric Col, et al.*, 399 F.Supp.2d 205 (S.D.N.Y. 2005) (upholding removal where alleged asbestos exposure

occurred in Navy shipyard); *Pack v. AC and S, Inc., et al.*, 838 F.Supp. 1099 (D.Md. 1993) (upholding removal where alleged asbestos exposure occurred in Navy Shipyard).

12. Metalclad has satisfied all of the three requirements and is entitled to remove the instant action.

13. All of the actions attributed to Metalclad, as alleged in Plaintiff's Complaint, were performed by Metalclad under the direction of federal officer, specifically under the direction, control, and supervision of an officer or agency of the United States Navy within the meaning of 28 U.S.C. § 1442(a)(1). Plaintiff's Complaint indicates that Mr. Moore worked as a shipfitter on board the USS *Drum*, the USS *Guitarro*, the USS *Hawkbill* and the USS *Pintado* from 1965 to 1971, and an insulator on board the USS *Pintado* from 1971 to 1974 at Mare Island Naval Shipyard in Vallejo, California. *See* Exhibit ("Exh") A to Feng Decl. In December of 1968, Metalclad brokered a shipment of Unibestos thermal insulation from Pittsburgh-Corning's Tyler, Texas, facility to the nuclear division of Mare Island for use in the reactor compartment of the USS *Drum*, the USS *Guitarro*, the USS *Hawkbill*, and the USS *Pintado*. *See* Exh. 1 to Declaration of Dan H. Heflin, Jr. ("Heflin Decl."); Exh. B to Feng Decl. The Navy independently solicited this procurement of Unibestos for a specified use aboard these submarines and that procurement was governed by a Navy contract. *See* Heflin Decl., ¶¶ 10-15; Exh. 1 to Heflin Decl. The award contract set forth specifications that mandated Naval oversight during production, identified where the Unibestos would be used, and, set forth the testing and verification requirements that were to be met prior to it being used in Naval Service. *Id.*

14. Metalclad has a colorable federal defense to Plaintiff's claims pursuant to the "government contractor defense." Liability for design defects in military equipment is prohibited under state law where: (1) the United States reasonably approved precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier, but were not known to the United States. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988).

15. The officers of the United States Navy approved reasonably precise specifications of the Metalclad-brokered shipment of Unibestos for use in the reactor compartment of the USS

McKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF REMOVAL TO FEDERAL COURT PURSUANT TO 28 U.S.C. § 1442(A)(1) (FEDERAL OFFICER)

*Drum*, the USS *Guitarro*, the USS *Hawkbill*, and the USS *Pintado*. In fact, as early as January, 1936, the Navy commissioned a 30-day study to determine Unibestos' suitability for use in the Naval Service. *See* Exh. 8 to Heflin Decl.; Heflin Decl., ¶¶ 12-13. As a result of that study, the Navy concluded that: (a) Unibestos had satisfactory heat insulating properties; (b) that a desirable property of Unibestos for Naval Service use was its light weight; (c) that it was questionable whether or not Unibestos possessed sufficient stability for use in the Naval Service; and, (d) that a 6-month service study was necessary to determine the stability of Unibestos. *Id.* On July 7, 1936, the Navy authorized another study to determine the suitability of Unibestos for use in the Naval Service at high temperatures. *See* Exh. 9 to Heflin Decl.; Heflin Decl., ¶¶ 12-13. The results of that study were issued on December 16, 1937, and found that Unibestos' heat insulating properties and light weight were desirable for use in Naval Service. *Id.* The December 15, 1936 appearance of Unibestos on restricted Navy specifications indicates the Navy immediately put it into use for Naval Service. *See* Exhs. C through I to Feng Decl. The Navy continued using Unibestos throughout the 1930s, the 1940s, and the 1950s and it remained on the Navy's Qualified Products List ("QPL") for the Metalclad-brokered shipment at issue here. *Id.* Pittsburgh Corning did not begin manufacturing Unibestos until July 1, 1962 when it purchased selected assets from Union Asbestos & Rubber Co. – some 26 years after the Navy became involved with Unibestos and at least 26 years after Unibestos appeared on a Navy's QPL. *See* Exhs. J through L to Feng Decl.

16. The Navy maintains a strict inspection program to assure that vendors comply with all government specifications. *See* Heflin Decl., ¶ 9E-H. To carefully control the products used and to ensure they meet the precise requirements necessary for their intended end use, the Navy maintains separate procurement and requirement departments. *See* Heflin Decl., ¶ 9I. All nuclear products and all non-nuclear products were procured through separate departments and access to nuclear products was prohibited by non-nuclear personnel. *Id.* The Navy also maintained separate specifications for thermal insulation and approved all such thermal insulation produced for the Navy. *See* Heflin Decl., ¶ 9H.

17. Before a manufacturer like Pittsburgh Corning received authorization to manufacture materials such as thermal insulation for use by the Navy, all of the design documentation had to first be inspected by the Navy. *See* Heflin Decl., ¶ 9F. The Navy had superior knowledge of the demands and requirements of combat-ready vessels and this knowledge required Naval control of military specifications. *See* Heflin Decl., ¶ 9G. Military specifications address all aspects of shipboard equipment and materials requirements, including whether the product contained asbestos and reflect the state of the art and the special needs of the Navy's combat vessels. *Id.* Further, the Navy had unique specifications for thermal insulation used aboard nuclear grade submarines and these specifications were communicated to outside vendors, including Pittsburgh Corning, by the Navy in Requests for Proposals for certain equipment and materials. *See* Heflin Decl., ¶ 9H.

18. A QPL pre-qualifies certain vendors to produce certain frequently used Navy-approved products, but a QPL provides a base specification only and does not guaranteed a product was suitable for use on every Navy application. *See* Heflin Decl., ¶ 9I-J. To accommodate the Navy's particular combat design interests for specific vessels or classes of vessels, the Navy often requires products appearing on a QPL to meet even stricter performance requirements than those specified by the range of performance parameters allotted for by the QPL alone. *Id.* In that instance, the Navy creates additional, separate specifications to guarantee the product meets the exact performance parameter required at all times throughout the entire life of the vessel. *See* Heflin Decl., ¶ 9L. The award contract relating to the Metalclad-brokered shipment of Unibestos required compliance with MIL-I-24244; thus, this production had to meet stricter requirements than the Navy's QPL. *See* Exhs. 1 and 3 to Heflin Decl.; Exh. 1 to Feng Decl.; Heflin Decl., ¶¶ 10-15. In short, stock Pittsburgh Corning Unibestos from the QPL would not have qualified for use on the USS *Drum*, the USS *Guitarro*, the USS *Hawkbill*, and the USS *Pintado* because it would not have met the Navy's corrosion and chemical specifications. *See* Heflin Decl., ¶¶ 10-15; Exhs. 1, 3 and 5 to Heflin Decl.; Exh. I to Feng Decl.

19. The Metalclad-brokered shipment of Unibestos was qualified for use on the submarines only because it was subject to additional corrosion, mercury, chloride and fluoride

analyses in accordance with MIL-I-24244 (Ships), a specification above and beyond what was required by the QPL. *See* Heflin Decl., ¶¶ 10-15; Exhs. 1, 3 and 5 to Heflin Decl.; Exh. 1 to Feng Decl. MIL-I-24244 is a unique military specification entitled Insulation Material With Special Corrosion, Chloride and Fluoride Requirements (ISSE Controlled Further Dissemination Only As Directed By NAVSEA System C-9B2) *See* Exh. 5 to Heflin Decl.; Heflin Decl.. ¶¶ 10-15. MIL-I-24244 is a highly classified document, accessible only by persons in the Naval Sea Systems Command or by the procuring agency, that specifies corrosion, chloride and fluoride requirements above and beyond what is provided for by the QPL. *Id.* General stock Unibestos insulation supplied pursuant to the QPL only, *i.e.*, not subject to the additional specifications of MIL-I-24244, would not have been appropriate for use given the Navy's express additional requirements invoked for materials intended for use in the nuclear areas of these submarines. *Id.*

20. As a direct result of the loss of the USS *Thresher* due to the piping failure in its nuclear reactor in 1963, the Navy created "The Submarine Safety Certification Program", known as "SubSafe", a program ensuring that every part of a submarine complied with strict specifications. *See* Exhs. N and O to Feng Decl.; Exh. 7 to Heflin Decl.; Heflin Decl. ¶ 9D. SubSafe was created to assure that every item affecting the submarine's pressure hull's watertight boundary and/or the ability of the submerged ship to recover from flooding was given significantly upgraded controls. *Id.* The propulsion system is critical to the vessel's recovery capability, and the associated piping is a critical to the propulsion system. *Id.* The insulation applied to that piping must be free of corrosion. *Id.* MIL-I-24244 provides additional requirements assuring freedom from corrosive materials, and is an element of "SubSafe," a key requirement of the specification. *Id.*

21. In 1939, the Navy promulgated instructions as to what it mandated with regard to heat insulation, which consisted of a compendium of requirements that it had developed over time. *See* Exh. 11 to Heflin Decl.; Heflin Decl., ¶ 14. The Navy department specifications originally specified asbestos by name. In a 1939 Navy department specification relating to pipe covering, the Navy specified asbestos in its molded pipe covering. *See* Exh. 12 to Heflin Decl.; Heflin Decl., ¶ 14. The insulation specifications continuously evolved over time. *See* Heflin

Decl., ¶ 14. By approximately 1955, with the advent of MIL-I-2781, the Navy had ceased specifying asbestos by name and had instead make it a performance specification citing criteria that the successful materials would have to exhibit and not specifying the constituent materials by name. *Id.* MIL-I-2781 is a developed specification from many years, which evolved from 1936 wherein Unibestos was specifically tested by the government and its product definition is amosite asbestos with a sodium silicate binder, and MIL-I-24244 is a specification that imposes additional requirements beyond those of MIL-I-2781 in order to satisfy the unique requirements of insulation to be applied to stressed stainless steel piping. *Id.*

22. Asbestos-containing thermal insulation was the industry standard of the day for high temperature applications and that remained the case until 1972 when the Navy officially changed the specifications to prohibit the further use of asbestos-containing products where acceptable alternatives had been determined. *See* Heflin Decl., ¶ 14; Exhs. 2 and 14 to Heflin Decl. As evidenced from a 1970 Navy Interim Report, the Navy had found no other alternatives that would satisfy MIL-I-2781 or MIL-I-24244 other than asbestos-containing Unibestos insulation. *See* Exh. 13 to Heflin Decl.; Heflin Decl., ¶ 14. Although the Navy did not call out asbestos by name in MIL-I-24244, it did invoke MIL-I-2781 as a baseline requirement. *See* Heflin Decl., ¶ 14. Since the Navy had itself participated in the development of Unibestos (which it specifically approved via QPLs under the specifications), it knew that the product had to contain asbestos in order to comply with the specification. *See* Heflin Decl., ¶ 14. As such, the Metalclad-brokered Unibestos was manufactured in accordance with precise specifications that were supplied by the Navy.

23. The Metalclad-brokered shipment of Unibestos conformed to military specifications. This shipment of Unibestos was required to and did meet exact corrosion, mercury, chloride and fluoride contamination requirements necessary for use in the submarines' nuclear compartments. *See* Exhs. 1, 3 and 5 to Heflin Decl.; Exh. 1 to Feng Decl.; Heflin Decl., ¶¶ 10-15. Prior to production, the Navy required Pittsburgh Corning to conduct exacting chemical analyses following explicit Navy protocol. *See* Exhs. 1, 3 and 5 to Heflin Decl.; Heflin Decl., ¶¶ 10-15. Prior to shipment, the Navy required Pittsburgh Corning to follow step-by-step

Navy testing procedures to determine the corrosion cracking capability of that specific shipment of Unibestos in order to meet specification MIL-I-24244. *See* Exhs. 1 and 3 to Heflin Decl.; Heflin Decl., ¶¶ 10-15. The Navy's requirement that Pittsburgh Corning certify this particular shipment of Unibestos in accordance with MIL-I-24244 demonstrates that the Navy was directly involved with the production of this shipment of Unibestos. *See* Heflin Decl., ¶¶ 10-15.

24. Additionally, the Navy required Defense Contractor Administration Service representatives ("DCAS"), employed by the Navy, to be present at Pittsburgh Corning's production facility during the specified testing and production. *See* Exh. 1 to Heflin Decl.; Heflin Decl., ¶¶ 9M and 11. DCAS's role was to ensure that Pittsburgh Corning complied with and met the required government specifications during production. *See* Heflin Decl., ¶ 9M. DCAS monitored the testing of the product to ensure that the vendor complied with each and every requirement specified by the Navy's testing procedure. *Id.* DCAS also independently reviewed, inspected and tested the product prior to shipment. DCAS served as the on-site "eyes and the ears" of the government and had the final say as to whether the production complied with the Navy's specification. *Id.* DCAS had the final say as to whether the product cleared for shipment. *Id.* The Award Contract makes clear that the on-site DCAS at Pittsburgh Corning's facility during this production of Unibestos was required to "witness the [corrosion] test [specified by MIL-I-24244], verify that the procedure [was] followed, and also to personally examine the test specimens . . . ." *See* Exh. 1 to Heflin Decl.; Heflin Decl., ¶ 11. In addition, the on-site DCAS was required to "verify that [Pittsburgh Corning's] laboratory [was] capable of performing the chemical analysis test" and "to verify that the test results furnished . . . . [were] in fact the ones taken from the lot" which Pittsburgh Corning supplied on the contract. *Id.*

25. Prior to shipping, the Navy required both Pittsburgh Corning and an on-site government inspector to independently certify that this lot of Unibestos met the Navy's exact specifications. *See* Heflin Decl., ¶ 11; Exhs. 1 and 3 to Heflin Decl. Moreover, once the shipment arrived at Mare Island, it was subject to further inspection and testing by government personnel. *See* Exh. 1 to Heflin Decl.; Exhs. B and P to Feng Decl.; Heflin Decl., ¶ 11. It was quarantined at MINS until March, 1969, to guarantee that it met the Navy's combat design

requirements for these nuclear grade submarines prior to ever being cleared for use. *Id.* As detailed above, the Navy clearly controlled the manufacture and supply of this lot of Unibestos.

26. The Navy possessed as much as or more information regarding the dangers of asbestos than did Metalclad during the relevant time periods. Specifically, the US Naval Medical Bulletin acknowledged that asbestos was a potential human health hazard in 1922, prescribed methods for dealing with dust, and recognized asbestos dust as causing specific physical symptoms. *See* Exh. Q to Feng Decl. By 1939, the Navy was conducting medical surveys of workers using asbestos-containing materials. *See* Exh. R to Feng Decl. In the early 1940s, the Navy and the United States Maritime Commission jointly sponsored a national conference to address the issues of safety and health requirements in government contract shipyards, resulting in the adoption of the Minimum Requirements for Health and Industrial Safety in Government Contract Shipyards, which specifically addressed the topic of dust suppression to avoid potential asbestos-related illnesses. *See* Exh. S to Feng Decl. The Navy further pursued safe work practices during the 1950s and 1960s to reduce the then-known risks associated with exposure to asbestos dust. *See* Exhs. M, T and U to Feng Decl.

27. Even as late as 1970, there were no other substitutes for thermal insulation required under MIL-I-24244 (*i.e.*, Unibestos), and the Navy maintained sole discretion for the materials it qualified. As noted in a Navy 1970 Interim Report on the feasibility of eliminating asbestos from use at shipyards, "The insulation materials used on stainless steel piping must meet the requirements of MIL-I-24244 regarding chloride content. None of the recommended materials [in this study] are qualified to meet this specification..." *See* Exh. 13 to Heflin Decl.

28. Nonetheless, Pittsburgh Corning had already begun affixing warnings to Unibestos, prior to this December 1968 shipment. *See* Exhs. J through L to Feng Decl. As of November 1968, Pittsburgh Corning began affixing a 5-inch by 3-inch notice to be printed in red on all cartons containing Unibestos. *Id.* Those warnings, which again were implemented before this shipment of Unibestos, read: "This product contains asbestos fibers. If dust is created when this product is handled, avoid breathing the dust. If adequate ventilation control is not possible, wear respirator approved by the U.S. Bureau of Mines." *Id.* Further, Navy specifications

McKenna Long &
Aldridge LLP
Attorneys At Law
San Francisco

- 10 -

NOTICE OF REMOVAL TO FEDERAL COURT PURSUANT TO 28 U S C § 1442(A)(1) (FEDERAL OFFICER)

addressed all communication placed on all materials supplied by outside contractors and the Navy utilized its own warning and training protocols regarding the use of asbestos. *See* Heflin Decl., ¶ 9N. Therefore, it is highly unlikely that the Navy would have allowed either Metalclad or Pittsburgh Corning to include additional warnings on this shipment regarding the potential risks of asbestos. *Id.* Because the Navy was aware of the potential health hazards of asbestos, and Pittsburgh Corning provided warnings on Unibestos, Metalclad had no duty to warn the Navy. *See Boyle* at 512; *Ramey v. Martin-Barker Aircraft,* 874 F.2d 946, 951 at n.10 (4th Cir. 1989) ["Because we conclude the Navy was already aware of the risk at issue, we need not consider whether [the manufacturer] would otherwise have been required to warn the Navy directly of the risk in order to assert successfully a military contractor defense."]; *Shuman v. United States,* 765 F.2d 283, 285-286 (1st Cir. 1989); *Sundstrom v. McDonnell Douglas Corp.,* 816 F.Supp. 587, 589-590, 595-596 (N.D. Cal. 1993).

29. Based upon the submitted evidence, Metalclad has demonstrated a causal nexus between Plaintiff's claims and acts it performed under color of federal office.

30. The U.S. Supreme Court and the Ninth Circuit have instructed courts to interpret 28 U.S.C. § 1442(a)(1) broadly in favor of removal. *See Arizona v. Manypenny,* 451 U.S. 232 (1981) (policy favoring removal should not be frustrated by narrow, grudging interpretations of § 1442(a)(1)); *Durham v. Lockheed Martin Corp.,* 445 F.3d 1247, 1252 (9th Cir. 2006) (noting that, because it is important to the federal government to protect federal officers, removal rights under section 1442 are much broader than those under 1441); *Ballenger v. Agco Corp.,* 2007 WL1813821 (N.D. Cal. 2007) (The Ninth Circuit instructs that there is a 'clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.').

31. The existence of a single removable claim allows removal of the entire action. 28 U.S.C. § 1441(c); *see also National Audubon Society v. Dept of Water,* 496 F Supp. 499, 509 (E.D. Cal. 1980).

32. Notice of removal has been filed with the state court and provided to all adverse parties pursuant to 28 U.S.C. § 1446(d).

33. This removal is based upon this Notice of Removal to the United States District Court, the Certificate of Service of Notice to Adverse Party of Removal, the Notice to Adverse Party of Removal filed in the state court action, the Declarations of Felicia Y. Feng and Dan H. Heflin, Jr. and attached exhibits, all process, pleadings, and orders that have been served upon Metalclad in the state court case, and any other matters that the Court deems applicable.

WHEREFORE, Defendant Metalclad Insulation Corporation hereby removes this action to the United States District Court for the Northern District of California, San Francisco Division, and seeks that the Superior Court of the State of California, County of San Francisco, proceed no further with respect to this action.

Dated: 4/16/10

MCKENNA LONG & ALDRIDGE LLP

By: _____
LISA L. OBERG
FELICIA Y. FENG

Attorneys for Defendant
METALCLAD INSULATION CORPORATION

SF:27420548.1